504 So.2d 1016 (1987)
STATE of Louisiana
v.
Ronnie TUGGLE.
No. 86 KA 1070.
Court of Appeal of Louisiana, First Circuit.
March 4, 1987.
Bryan Bush, Dist. Atty. Office of the Dist. Atty. by Jesse Bankston, Asst. Dist. Atty., Baton Rouge, for plaintiff-appellee.
Johnny E. Wellons, Baton Rouge, for defendant-appellant.
*1017 Before EDWARDS, WATKINS and LeBLANC, JJ.
WATKINS, Judge.
Ronnie Tuggle was charged by indictment with four counts of aggravated kidnapping and one count of aggravated burglary, in violation of LSA-R.S. 14:44 and 14:60, respectively. In the same indictment, he was also charged with one count of aggravated rape and one count of attempted aggravated rape, in violation of LSA-R.S. 14:42 and 14:27. The defendant pled not guilty and not guilty by reason of insanity. A sanity commission subsequently determined that the defendant was competent to stand trial. After trial, a jury found the defendant guilty as charged on all four counts of aggravated kidnapping. The jury also returned guilty verdicts for the attempted aggravated rape charge and the aggravated burglary charge. However, the jury was unable to reach a verdict on the aggravated rape charge, and the trial court declared a mistrial on this charge.
For each of the four aggravated kidnapping convictions, the defendant received the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. For the aggravated burglary conviction, the defendant received a sentence of thirty years at hard labor. The trial court imposed the above five sentences concurrently. However, for the attempted aggravated rape conviction, the defendant received a consecutive sentence of fifty years at hard labor. The defendant has appealed, alleging six assignments of error, as follows:
1. The defendant contends that the prosecution did not prove each element of the crime of aggravated kidnapping.
2. The defendant contends that he did not commit aggravated burglary.
3. The defendant contends that the testimony of three expert witnesses proves that he was insane at the time these crimes were committed.
4. The defendant contends that the guilty verdicts in this case were contrary to the law and the evidence.
5. The defendant contends that the prosecution did not prove each element of the crimes charged.
6. The defendant contends that the jury erred by not finding him insane at the time these offenses were committed.
Assignments of error numbers 4, 5, and 6 were not briefed on appeal and are, therefore, considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.
Shortly before 4:00 p.m. on February 28, 1986, the defendant, Ronnie Lee Tuggle, and his wife, Wanda, drove to the victims' (hereinafter referred to as the Doe family) home, located in Baton Rouge, Louisiana. Mr. Doe was at work. The house was occupied by Mrs. Doe and her four children: a daughter, age ten, and three sons, ages eight, six, and one. When the daughter heard a car pull into the driveway, she thought it was her grandmother and went to the back door. When she opened the door, the defendant, in the daughter's words, "just walked in." He went into the living room and asked Mrs. Doe if her husband was home, stating he wanted to talk to him about some yard work. The defendant had cut the grass for the Doe family on several occasions during the previous summer. When Mrs. Doe replied that Mr. Doe was not home, the defendant produced a gun and asked Mrs. Doe if she had any diamonds or silver. When she replied that she did not, he asked her about how much money she had in her purse and in her checking account. When she told him to leave the house, he aimed the gun at the face of her six year old son and stated: "[T]his one will be the first to go."
After approximately ten minutes, the defendant told Mrs. Doe that they were going to leave the house with him. When she refused, he grabbed her hair and sweater and jerked, knocking her to her knees. The defendant forced Mrs. Doe and her three older children to leave the house and get into their van. The infant son remained in his crib. When Mrs. Doe was exiting her house, she saw the defendant's *1018 wife, Wanda Tuggle, get into a car and back out of the driveway. The defendant let Mrs. Doe drive the van until they left her subdivision. At that point, he ordered her to move over, and he drove them to the Alamo Plaza Motel on Florida Boulevard. When they exited the van and entered Room 1002, they observed that Wanda Tuggle had already arrived and was waiting for them. While Wanda Tuggle remained at the Alamo Plaza with the children, the defendant forced Mrs. Doe to drive to a Fidelity Bank and cash her paycheck and a personal check which amounted to a total of approximately $352.00. At this point, the defendant abandoned the van at a park near the Alamo Plaza Motel. Since his car had been locked with the keys inside it, he used his pistol to shoot the window out of his own car in the presence of Mrs. Doe. He then turned to her and stated: "I guess you know now that it's a real gun."
They got in the defendant's car, and the defendant drove to an area of Baton Rouge which was unfamiliar to Mrs. Doe. While in this area, the defendant made a drug purchase. He then drove to another motel where he forced Mrs. Doe to have sexual intercourse with him. After forcing her to take a shower with him, they returned to the Alamo Plaza Motel. They learned that Mrs. Doe's children were hungry, so the defendant forced Mrs. Doe to go with him to get some food for the children. After the defendant purchased some chicken at a fast food restaurant, he drove to several locations attempting to purchase more drugs. After making another drug purchase, he took Mrs. Doe to another motel and again forced her to have sexual intercourse with him. She testified that he never put the gun down even when he forced her to take another shower with him.
When they returned to the Alamo Plaza Motel room, Mrs. Doe persuaded Mrs. Tuggle to let her two boys go free. Mrs. Tuggle drove the two boys to a location in Scotlandville and released them. When Wanda returned, the defendant told her to go and purchase some more drugs. She left and returned shortly thereafter with some drugs, which she gave to the defendant. Eventually, the defendant informed Mrs. Doe that he was going to release her ten-year-old daughter as well. In fact, the defendant took the girl to his house and attempted to have sexual intercourse with her also but was unable to achieve penetration.
Shortly after the defendant left the Alamo Plaza Motel with the daughter, law enforcement officers arrived, arresting Wanda Tuggle and transporting Mrs. Doe to a hospital. A few minutes later, law enforcement officers arrested the defendant at his home and also transported the daughter to a hospital. During this entire episode, the defendant had injected himself with a syringe numerous times. He also injected Mrs. Doe and her daughter. Apparently, the defendant was using cocaine, since tests run at the hospital indicated the presence of cocaine in the urine of both Mrs. Doe and her daughter.

ASSIGNMENT OF ERROR NUMBER ONE:
In this assignment of error, the defendant contends that there was not sufficient evidence to prove each element of the crime of aggravated kidnapping.
The standard of review for the sufficiency of evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. See LSA-C. Cr.P. art. 821; State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983). We note that, in order to challenge a conviction on the basis of insufficiency of the evidence, the defendant should have proceeded by way of a motion for post verdict judgment of acquittal. See LSA-C.Cr.P. art. 821. Nevertheless, we will consider a claim of insufficiency of the evidence which has been briefed pursuant to a formal assignment of error.
LSA-R.S. 14:44 provides, in pertinent part:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other *1019 person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another;...
In this case, the evidence clearly indicates that the defendant, armed with a pistol, entered the home of the victims and forced them to go with him to the Alamo Plaza Motel. In his brief, however, the defendant argues that an essential element of the crime of aggravated kidnapping was not proved because he "did not demand or force the victim to give up anything of apparent present or prospective value." In fact, the defendant's argument does not reflect the facts presented at the trial. When the defendant entered the Doe residence, he immediately asked Mrs. Doe if she had any diamonds or silver. He then inquired about the amount of money in her purse and her checking account. This testimony clearly indicates that the defendant was interested in obtaining money from Mrs. Doe. When testifying about how the defendant forced her to cash two checks at the bank, Mrs. Doe stated that the defendant said: "I'll let you go if you just give me the money, that's all I want." The evidence in this case clearly proved the "extortion" element of aggravated kidnapping. See State v. Branch, 475 So.2d 388, 392 (La.App. 1st Cir.1985).
This assignment of error is meritless.

ASSIGNMENT OF ERROR NUMBER TWO:
In this assignment of error, the defendant contends that the evidence did not prove each element of the crime of aggravated burglary. Specifically, the defendant contends that, since Mrs. Doe's ten-year-old daughter let him into the house, there was no unauthorized entry.
LSA-R.S. 14:60 provides:
Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3) Commits a battery upon any person while in such place, or in entering or leaving such place.
Whoever commits the crime of aggravated burglary shall be imprisoned at hard labor for not less than one nor more than thirty years.
In State v. Lozier, 375 So.2d 1333, 1336, (La.1979), the Louisiana Supreme Court stated:
In the case of a private dwelling a person must have the consent of an occupant or an occupant's agent to constitute a defense to "unauthorized" entry. This consent must be given by a person with authority and capacity to consent. The consent must be voluntary and intelligent, that is, based on a reasonable understanding of the identity and purpose of the intruder. Obviously, a child who admits a total stranger would not necessarily have sufficient understanding of the circumstances of the entry to give valid consent to an entry. On the other hand once a maid, friend, or employee is given general consent to enter a house at certain times, that consent will generally remain valid until revoked or the terms of the consent exceeded. [Citations omitted].
The following testimony relates to the defendant's entry into the Doe residence. On direct examination, Mrs. Doe's ten-year-old daughter stated:
Q I want to call your attention back about three months ago, and I'm going to ask you some questions about what happened. Do you remember a man coming to your house which you let in?
A Yes, sir.
Q Did you know that man?
A Yes.
Q What was his name?
A Ronnie Tuggle.

*1020 Q How did you know that?
A He had worked in our yard. I think last Summer.
Q Did you let him in the house?
A Yes. I opened the door and then he just walked in.
On direct examination, Mrs. Doe stated:
A ... And so I was, I was just kind of on the couch, just resting, and I heard a car go by, and Vicki heard a car come in the driveway, too, because she came out of the bedroom. And I said, oh, is that grandma, and that's who I thought it was, because that's who we were expecting. And Vicki walked past the den into the utility room where the back door is, and then she went on back into the den, and she had this funny look on her face, and I said, well, Vicki, if it's grandma, tell her to come on in. And the next thing I knew, Ronnie Tuggle was standing in the doorway.
Q Did you, did you invite him into your home at that time?
A No.
The above testimony clearly indicates that the defendant did not have Mrs. Doe's consent to enter the home. Although Mrs. Doe's ten-year-old daughter testified that she let the defendant in the house, her exact words were: "I opened the door and then he just walked in." Although Mrs. Doe's daughter knew that the defendant had performed yard work for them in the past, her answer does not indicate that she gave the defendant specific permission to enter the house. In fact, Mrs. Doe's testimony that her daughter "had this funny look on her face" when the defendant entered the house indicates that the little girl was surprised and confused by the defendant's entry into the house. Even assuming that the defendant entered the house with the daughter's consent, a ten-year-old girl lacked the authority and capacity to give such consent. As stated in State v. Lozier, supra, such consent "must be voluntary and intelligent, that is, based on a reasonable understanding of the identity and purpose of the intruder." Under the circumstances, we conclude that the defendant's entry into the Doe residence was "unauthorized".
This assignment of error is meritless.

ASSIGNMENT OF ERROR NUMBER THREE:
In this assignment of error, the defendant contends that the jury erred in failing to return a verdict of not guilty by reason of insanity. He argues that expert testimony at the trial proved that he did not know the difference between right and wrong when he committed these crimes.
The defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. LSA-C.Cr.P. art. 652. If the circumstances indicate that because of a mental disease or a mental defect the defendant was incapable of distinguishing between right and wrong with reference to the conduct in question, the defendant shall be exempt from criminal responsibility. LSA-R.S. 14:14.
The standard of review applicable when a defendant pleads the affirmative defense of insanity and claims that there is insufficient evidence to support a finding of guilty beyond a reasonable doubt is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. McClinton, 492 So.2d 162, 167 (La.App. 1st Cir.1986); State v. Heath, 447 So.2d 570, 575 (La.App. 1st Cir.), writ denied, 448 So.2d 1302 (La.1984).
When the defendant pleads not guilty and not guilty by reason of insanity, the determination of defendant's sanity at the time of the offense is a jury question. State v. Burton, 464 So.2d 421, 427 (La. App. 1st Cir.), writ denied, 468 So.2d 570 (La.1985). All of the evidence, including both expert and lay testimony and conduct and action of the defendant, should be considered by the jury in determining sanity. State v. Heath, supra.
In this case, the defendant did not testify, nor did his wife. In support of his *1021 insanity plea, the defendant presented the expert testimony of a psychiatrist, Dr. Louis Cenac, who examined the defendant on April 25 and May 9, 1986. On direct examination, Dr. Cenac discussed the effects of cocaine on the brain and central nervous system. He testified that cocaine dependency would affect a person's judgment and that the primary concern of a chronic cocaine abuser would be to secure more of the drug. He also testified that a combination of alcohol and cocaine use could cause periods of memory loss.
On cross-examination, Dr. Cenac listed his diagnoses of the defendant. His first diagnosis was that the defendant, at first, was uncooperative and malingering. His second diagnosis was that the defendant was a learning-disabled child, because he had reached the tenth or eleventh grade but could not read or write. His final diagnosis was that the defendant was schizophrenic. He noted that the defendant's father and brother had received hospital treatment for schizophrenia.
Dr. Cenac testified that he concluded that the defendant was antisocial and paranoid. When asked if the defendant was psychotic, Dr. Cenac testified that the defendant had related stories of auditory and visual hallucinations. Dr. Cenac stated he believed that the auditory hallucinations were real but that the defendant was lying about his visual hallucinations. According to Dr. Cenac, the defendant's primary symptom was his inability to remember the commission of these offenses. Finally, when asked if the defendant was "legally insane" when he committed these offenses, Dr. Cenac answered: "he was taking a substance which is known to change perceptions, there was a perceptual distortion, and that laboring under these factors, his judgment was impaired, and that he had a diminished capacity to know right from wrong." Then, Dr. Cenac concluded: "Statement of insanity is for the jury to decide."
On redirect examination, Dr. Cenac stated:
The use of the terms "right and wrong" is a legal definition. There's no part of psychiatry that teaches what is right or teaches you what is wrong. That's a legal definition for the jury to decide. My statement is: That his ability to limit his activities to normal social behavior was grossly impaired, deficient, and his capacity to weigh the consequences of his actions in the present time against his past history is impaired. Now, that's what a medical doctor and psychiatrist would say in answer to your question. Right or wrong is not a psychiatric term.
And again on recross examination, Dr. Cenac stated:
Right from wrong is not a question for psychiatrists to decide. However, if you force me, I will answer your question. Right from wrong is the prerogative of the jury, not the psychiatrists. Psychiatrists have far too much to say about these matters. My situationmy statement isand I think we have very clear evidencethat his perceptions of himself and of his situation were sufficiently impaired that he did not know what was right and he did not know what was wrong. That, I will tell you, but that is not a psychiatric opinion, even though I am a psychiatrist. That opinion, whether somebody knows right from wrong, is the opinion of the jury.
The state also presented expert testimony on the issue of the defendant's sanity. Dr. Francisco Silva, a psychiatrist, testified that he examined the defendant on May 16, 1986. Dr. Silva stated that the defendant was not psychotic at the time of the interview and that he was in good contact with reality. Dr. Silva testified that the defendant had no history of mental illness but had a history of cocaine, Dilaudid, and alcohol abuse. Dr. Silva testified that he diagnosed the defendant as antisocial and paranoid but that these were personality disorders, not mental disorders.
According to Dr. Silva, the defendant stated at this interview that, while he was in jail, he had heard voices telling him to kill himself. However, Dr. Silva testified that the defendant was not psychotic at the time of the interview. Dr. Silva stated that the defendant was aware of the charges *1022 against him but that he did not remember any of the events which took place when he committed these offenses. Dr. Silva concluded that his examination of the defendant did not reveal any signs of serious mental disorder.
On cross examination, Dr. Silva testified that the use of alcohol and cocaine could cause a "blackout". However, on redirect examination, he testified that he had no reason to believe that the defendant was legally insane when he committed these offenses.
Dr. Hypolite Landry, a physician who is the coroner of East Baton Rouge Parish, also testified on behalf of the state. Dr. Landry examined the defendant on May 13, 1986. Dr. Landry testified that the defendant appeared to be suffering from some degree of depression, which might have been due to drug withdrawal symptoms and/or being in prison. Dr. Landry testified that the defendant stated that he could not remember anything that occurred the week before he committed these offenses. According to Dr. Landry, the only thing that the defendant remembered about the entire episode was that he woke up in jail. However, Dr. Landry was unable to elicit a history or symptoms of psychosis at anytime during the defendant's life, and he expressed concern that the defendant might be malingering. Finally, Dr. Landry concluded that he had no reason to believe that the defendant did not know the difference between right and wrong during the week preceding the commission of these offenses. After further questioning, although Dr. Landry admitted that the use of cocaine and alcohol might have impaired the defendant's judgment, he stated that he had no reason to believe that the defendant was drugged or intoxicated to the extent that he did not know the difference between right and wrong when he committed these offenses.
As we noted, the jury was free to consider all of the evidence in determining the defendant's sanity. The state's expert witnesses, Dr. Silva and Dr. Landry, both testified that there was nothing to lead them to conclude that the defendant was not sane at the time he committed these offenses. Furthermore, from the excerpts of his testimony included above, it is obvious that Dr. Cenac was reluctant to conclude that the defendant was legally insane at the time he committed these offenses. He repeated several times that the determination of the defendant's sanity was for the jury to decide. In fact, his first reply to this question was that the defendant "had a diminished capacity to know right from wrong." However, this jurisdiction does not recognize the doctrine of diminished reponsibility. State v. Burton, supra. A mental defect short of legal insanity cannot serve to negate specific intent and reduce the degree of the crime. State v. Burton, supra.
We have made a careful review of the evidence presented on the issue of the defendant's sanity at the time he committed these offenses. Viewing this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that the defendant failed to prove his insanity by a preponderance of the evidence.
This assignment of error is meritless.
The convictions and sentences are affirmed.
AFFIRMED.